Sam P. Israel, P.C.
Sam P. Israel (SPI0270)
180 Maiden Lane, 6th Floor
New York, New York 10038
T: (646) 787-9880 | F: (646) 787-9886

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KAPOOR COTSYN EXPORTS, and RISHAV EXPORTS, <br><br> Plaintiffs, <br><br> -against- <br><br> JATINDER DHALL, 30 BELOW CORP., TIME SQUARE FOOD IMPORTS LLC, SEENA INTERNATIONAL INC., HARKIRAN BHASIN, TOLL GLOBAL FORWARDING (INDIA) PVT. LTD., SEAWAY INTERNATIONAL INC., and SEAMASTER LOGISTICS, INC., <br><br> Defendants. | Index No. _____ <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiffs Kapoor Cotsyn Exports ("**KCE**") and Rishav Exports ("**RE**") (together, the "**Plaintiffs**"), by and through their undersigned counsel, Sam P. Israel, P.C., as and for their complaint against defendants Jatinder Dhall ("**Dhall**"), 30 Below Corp. ("**30 Below**"), Time Square Food Imports ("**TSFI**"), Seena International Inc. ("**Seena**"), Harkiran Bhasin ("**Bhasin**") (together with Dhall, 30 Below, TSFI and Seena, the "**Dhall Defendants**"), Toll Global Forwarding (India) Pvt. Ltd. ("**Toll**"), Seaway International Inc. ("**Seaway**"), and Seamaster Logistics, Inc. ("**Seamaster**") (collectively, the "**Defendants**") allege the following:

1

## NATURE OF THE ACTION

1.      This action is brought by two apparel sourcing companies that seek to recover $3.18 million, together with the applicable costs, fees and interest, due and owing to Plaintiffs for branded apparel that they designed, manufactured, and caused to be delivered to the Dhall Defendants in fulfillment of Dhall's purchase orders on behalf of 30 Below, TSFI, and Seena, which are owned by Dhall and his sister, Bhasin, and which operate as their owners' alter egos. As reflected on the undisputed invoices, in multiple text messages, and in accordance with the parties' course of dealing and industry practice, the Plaintiffs timely manufactured conforming goods and entrusted them into the care of defendant Toll—the principal forwarding company that arranged with defendant carriers Seamaster and Seaway to ship the goods from India to New York and release them only after Dhall tendered payment for the goods, thus triggering Plaintiffs' relinquishment of the appurtenant Original Bills of Lading.

2.      Yet, Dhall and Bhasin entered into a clandestine arrangement with Toll, Seamaster, and Seaway to unlawfully break the seals on the containers once they reached the New York port, and release the subject goods into Dhall's custody without notice, payment, authorization, or the Original Bill of Lading ("**OBL**") from Plaintiffs—all in violation of the parties' agreements, OBL terms, course of dealing, and Toll's duties of care and loyalty as the Plaintiffs' trusted forwarder and bailee. The Plaintiffs only discovered the fraudulent scheme when they tracked the subject containers to their subsequent destinations after leaving the New York port.

3.      Upon Plaintiffs' discovery that the goods had been released without payment or authorization, Dhall came to admit that he breached the parties' contracts (as reflected in multiple text messages and emails) and promised to pay even as he entreated for more time to do so, all the while acknowledging that he took the goods without paying the invoiced amounts. The Dhall Defendants even placed an additional *twenty-seven* purchase orders with Plaintiffs to deceive them into believing that the corporate defendants are sufficiently capitalized and that Dhall intended to continue the parties'

2

business relationship. Dhall would come to resell all or many of the goods he obtained through deceitful means and with Toll's aid, even as he failed to pay for them.

4.    Dhall came to repudiate his payment obligations in connection with the 27 purchase orders with KCE. Pursuant to the sales contracts and parties' course of dealing, KCE immediately and without delay devoted its own capital to hiring workers, manufacturers, quality control personnel, raw materials, machinery, vendors, and other personnel to the labor-intensive manufacturing of the custom goods for Dhall and his corporations. KCE completed the labor and resource intensive process of manufacturing the goods in accordance with the 10 purchase orders at issue and made significant capital and labor investments in manufacturing the rest of the goods, only to discover that Dhall had no intention of honoring his contractual obligations. The details of these additional contracts and Dhall's promises to pay for same are confirmed in numerous text messages, emails and telephone conversations with the Plaintiffs' representatives.

5.    In addition to the forwarder and shipping companies, Dhall's fraudulent scheme involves fungible shell companies through which he and his sister have deceived and swindled other merchants, the Plaintiffs being but their latest victims. Corporate defendants 30 Below, TSFI, and Seena are all alter egos of one another; Dhall and Bhasin have dominated and controlled the family-owned corporations, fostered the conversion of goods and wrongfully profited from it.

6.    By way of this action, the Plaintiffs seek to hold Toll liable for breach of fiduciary duties to the Plaintiffs in connection with the unlawful release of goods; the Dhall Defendants liable for conversion, price of goods sold, breach of contract, indemnification, and unjust enrichment; and Seaway and Seamaster liable for aiding and abetting conversion, as well as breach of legal duties under the Carriage of Goods by Sea Act ("**COGSA**").

## PARTIES

7.    Plaintiff Kapoor Cotsyn Exports (KCE) is a foreign manufacturing and exporting company based in India with a principal place of business at 15-B, Textile Colony Industrial Area "A" Ludhiana – 141003, India.

8.      Plaintiff Rishav Exports (RE) is a foreign manufacturing and exporting company based in India with a principal place of business at E-2154/1 Textile Colony Industrial Area "A" Ludhiana – 141003, India.

9.      Upon information and belief, defendant Jatinder Dhall a.k.a. "Ricky Singh" Dhall is a natural person residing at 375 Hook Road, Katonah, NY 10536 and principal of 30 Below, TSFI, and Seena.

10.      Upon information and belief, Harkiran Bhasin is a natural person residing in New York State and Dhall's sister, business partner, and principal of 30 Below, TSFI, and Seena.

11.      Upon information and belief, 30 Below is a New York corporation that is owned and operated by Dhall and Bhasin, with a principal place of business at 1140 Motor Parkway, Ste. A, Hauppauge, New York 11788.

12.      Upon information and belief, Time Square Food Imports LLC is a New York corporation that is owned and operated by Dhall and Bhasin, with a principal place of business at 1140 Motor Parkway, Ste. A, Hauppauge, New York 11788.

13.      Upon information and belief, Seena International Inc., is a New York corporation that is owned and operated by Dhall and Bhasin, with a principal place of business at 1140 Motor Parkway, Ste. A, Hauppauge, New York 11788.

14.      Upon information and belief, Toll is an integrated logistics provider in Asia, including in India, where it provides supply chain and freight forwarding services to customers operating in India; its offices are located at 9 A Puzhal Ambattur Road Puzhal, Chennai 600066, Tamil Nadu, India. Upon information and belief, Toll Group has multiple affiliates, subsidiaries and/or sister corporations throughout the world, including Toll Global Forwarding Holdings (USA), Inc., which owns and operates defendant Seamaster.

15.      Upon information and belief, Seamaster Logistics, Inc. is a New Jersey corporation with a principal place of business at 1370 Valley Vista Drive, Suite 150, Diamond Bar, California 91765; it is registered as a carrier with Federal Maritime

Commission. Upon information and belief, Seamaster is a subsidiary or affiliate of Toll Global Forwarding Holdings (USA), Inc.

16.     Upon information and belief, Seaway International Inc. is a New York corporation operated by Daniel Chin Kim (as the chief executive officer), with a principal place of business at 350 7th Avenue, New York, NY 10001; it purports to do business as an ocean carrier but is not registered with the Federal Maritime Commission.

## JURISDICTION AND VENUE

17.     The Court has subject matter jurisdiction over this action because this action involves claims under COGSA and admiralty or maritime claims within the meaning of Rule 9 of the Federal Rules of Civil Procedure and is within the admiralty and maritime jurisdiction of the United States under 28 U.S.C. § 1333(1).

18.     The Court has personal jurisdiction over the Defendants because some or all of them reside and do business in this State and District; and/or due to their purposeful activities within the State which have given rise to the Plaintiff's injuries; and/or by reason of the Defendants' continuous and systematic conduct of business within this State and District.

19.      Venue is proper in this judicial District pursuant to 28 U.S.C. § 1391 because some or all of the Defendants reside or maintain their corporate headquarters office in this District, and/or because a substantial part of the events or omissions giving rise to the underlying claims occurred in this District and substantial part of the property that is the subject of the action is situated in this District.

## FACTS

**Plaintiffs' Operations and the Parties' Course of Dealing:**

20.     The Plaintiffs are family-owned apparel manufacturing and exporting companies located in Ludhiana, India. KCE is wholly owned and operated by Rishi Kapoor, and RE is owned in equal parts by Rishi Kapoor and his father, Dalip Kapoor.

21.     The Plaintiffs have been in the business since the 1990s, and achieved considerable goodwill among their clientele, vendors, suppliers and trading partners.

22.     The majority of the Plaintiffs' business involves fulfillment of clients' purchase orders for custom goods and apparel, then arranging for customs clearing and shipment of the goods to the United States.

23.     Generally, the Plaintiffs invest their own capital and labor into manufacturing and preparing the goods for international shipment. Upon receipt of a purchase order, Plaintiffs confirm the material terms (such as price, quantity, approximate delivery date) of the transaction with the purchaser and then begin to order the necessary materials, hire vendors and contract with suppliers in order to manufacture the conforming goods and prepare them for international shipment. To cover certain upfront expenses of the manufacturing process, the Plaintiffs often secure a line of credit or a loan from their local bank. Their ability to pay vendors and make timely loan payments largely depends on timely and complete payments from the purchaser.

24.     In addition, the Plaintiffs secure the services of a principal forwarding company — here, Toll — to arrange for shipment by ocean carrier and delivery of cargo to the consignee (i.e., purchaser) at the port of destination upon payment for same.

25.     As is customary in the exporting business and Plaintiffs' course of dealing with Dhall and Toll, the forwarder would take custody of the goods and subsequently issue Original Bills of Lading  to Plaintiffs (the shippers), which represent the title to the goods and are only released to the consignee after the forwarder ensures that the goods are delivered and Plaintiffs have received full payment for them.

26.     The OBLs are maritime contracts requiring substantial carriage of cargo by sea and they govern the terms of the business transactions among the Plaintiffs, forwarder, and Dhall Defendants.

27.     After the goods are cleared by customs and transferred to the forwarder, the OBLs are the only thing left with the Plaintiffs guaranteeing payment from the consignee.

28.     Whereas, normally, the goods are shipped via ocean carriers in sealed containers, the custodian of the goods cannot allow anyone to break the seals on the containers or take possession of the goods unless and until the OBLs are released by the Plaintiffs following payment.

29.     In accordance with the industry practice and course of dealing described above, the Plaintiffs entered into a business relationship with Dhall and his companies in 2017, when Dhall began to place purchase orders for large quantities of custom goods to be manufactured and shipped to him in New York.

30.     Throughout the parties' business relationship and in their course of dealing, Dhall would send purchase orders to the Plaintiffs, and the Plaintiffs would confirm the price, quantity, ship date, and other material details of the transaction.  The goods would always be sold outright and payment would be due upon receipt at the shipping port of destination.

31.     Based on this understanding and in reliance on Dhall's purchase orders and sales confirmations, the Plaintiffs would devote their own capital to cover the upfront costs of hiring workers, manufacturers, quality control personnel, raw materials, machinery, vendors, and other personnel to the labor-intensive manufacturing of the custom goods for Dhall and his corporations.

32.     The Plaintiffs would transmit to Dhall detailed invoices reflecting the quantity of goods, price, shipment information, and payment due dates.

33.     The Plaintiffs also would secure Toll's services as the principal forwarder and instruct Toll to deliver the goods to Dhall in New York following payment for same. As part of its duties to Plaintiffs, Toll would take possession of the finished goods, and cause to be issued OBLs reflecting Toll and Plaintiffs' agreement concerning the shipping, handling, custody, delivery and payment of the goods. In other words, Toll was the Plaintiffs' trusted custodian and fiduciary responsible for obtaining payment, issuing OBLs, and ensuring that the goods were delivered to the consignee.

34.     For its part, Toll generally arranged for a carrier to transport the goods to New York. The goods would remain in the forwarder's care until Plaintiffs received payment and surrendered the OBLs.

35.     Payment was due upon the goods' arrival. Because the shipping port of destination generally allows goods to remain onboard the carrier for approximately five to eight days, Dhall would accept the goods and remit payment within five to eight days from the goods' arrival, after which the Plaintiffs would surrender the OBLs.

36.     From the inception of the parties' business relationship in fall 2017 and for approximately six months thereafter, Toll successfully arranged for delivery of the goods and Dhall steadily paid on time and in full. During that time, Dhall continued to submit purchase orders for additional goods to be designed and manufactured pursuant to Dhall's specifications.

37.     Yet, after gaining the Plaintiffs' trust, Dhall stopped tendering timely and complete payments. Despite Dhall's nonpayment, Toll not only failed to inform Plaintiffs of the situation but continued to allow Dhall to unload the cargo and take possession of the goods without paying for them and without the obtaining title to them by virtue of Plaintiffs' release of the OBLs. Though he ultimately accepted the goods and resold them, Dhall began making legally insupportable excuses for his payment defaults, and ultimately defaulted on his contractual obligations.

**The $1,233,263.88 in Unpaid Invoices and Stolen Goods.**

38.     As set forth below, Toll unlawfully released certain goods to Dhall without the OBLs and failed to secure Dhall's payment in connection with: (i) the seventeen unpaid KCE invoices issued between May 2018 and October 2018 for the sum of $864,061.68 worth of goods (the "**KCE Goods**"); and (ii) six (of eight) unpaid RE invoices issued between April 2018 and October 2018 for the sum of $293,065 worth of goods (the "**RE Goods**"); Dhall failed to pay an additional $76,137.20 for the RE Goods that were delivered through a third party forwarder and ocean carrier.

**The KCE Goods:**

8

39.     From January 2018 to April 2018, Dhall, by and through 30 Below, entered into various agreements with Plaintiff KCE to purchase custom goods that would be designed and manufactured by KCE, then delivered to Dhall in New York, with Toll's aid as the Plaintiffs' forwarder.

40.     In response to each of Dhall's orders, KCE immediately and without delay devoted its workers, manufacturers, quality control personnel, raw materials, machinery, vendors, and other personnel to the labor-intensive manufacturing of the KCE Goods.

41.     KCE then transmitted invoices to Dhall, which Dhall timely received and without objection as to the quantity of KCE Goods, amounts stated, shipment dates, payment amounts and due dates.

42.     KCE also secured Toll's services as the forwarder and entrusted the Goods into Toll's custody and care with instructions for Toll to deliver the containers of Goods to Dhall in New York upon payment for same.

43.     Toll's responsibilities included securing an ocean carrier, issuing the OBLs, loading the KCE Goods onto the carrier, delivering them from India to New York, and, after securing payment for same, alerting KCE to release the OBLs (thus transferring title of the KCE Goods to Dhall).

44.     Toll secured the carrier services of Seamaster and Seaway to carry the cargo to the U.S.

45.     Upon informaiton and belief, the KCE Goods were loaded onto the carrier in sealed containers, which seals could only be broken with KCE's permission.

46.     Upon information and belief, the KCE Goods arrived at the designated shipping port of destination in New York, whereupon Dhall, Toll, Seaway and Seamaster conspired to break the seals on the containers and relinquished the KCE Goods to Dhall without collecting the required payment for same or notifying KCE.

47.     The Plaitniff would come to discover after inquiring with Toll about the status of its shipments and the unpaid invoices, that the containers not only arrived to port, but the forwarder allowed their seals to be broken and containers emptied of KCE Goods despite failing to collect payment. Based on KCE's internal records reflecting its

account summary with Dhall Defendants, the following invoices (the "**KCE Invoices**") remain unpaid:

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **KAPOOR COTSYN EXPORTS - COMPLETE ACCOUNT STATEMENT AS ON 22th NOV 2018** | | | | | | | | | | | | |
| SR. NO. | Invoice Number | DATE | BUYER NAME | FORWARDER | AGENT NAME IN USA | CONTAIN ER NO | CTNS | QNTY | ETD | ETA | INVOICED AMONT (USD) | BALANCE PAYMENT (USD) |
| 12 | KCE-BXF-004 | 8/May/18 | 30 BELOW CORP. | TOLL GLOBAL FORWARDING (INDIA) PVT. LTD. | SEWAY INTERNATION AL INC. | UACU591 1120 | 2271 | 27252 | 18-May | 6-Jun | 85,477.80 | 85,477.80 |
| 13 | KCE-BXF-005 | 11/May/18 | 30 BELOW CORP. | TOLL GLOBAL FORWARDING (INDIA) PVT. LTD. | SEWAY INTERNATION AL INC. | TCNU907 6738 | 2232 | 26784 | 24-May | 14-Jun | 83,818.68 | 83,818.68 |
| 14 | KCE-BXF-006 | 15/May/18 | 30 BELOW CORP. | TOLL GLOBAL FORWARDING (INDIA) PVT. LTD. | SEWAY INTERNATIONA L INC. | OOCU649 4658 | 2271 | 27252 | 24-May | 14-Jun | 85,437.24 | 85,437.24 |
| 15 | KCE-BXF-007 | 19/May/18 | 30 BELOW CORP. | TOLL GLOBAL FORWARDING (INDIA) PVT. LTD. | SEWAY INTERNATIONA L INC. | TCNU5944 523 | 1162 | 13944 | 30-May | 18-Jun | 50,376.00 | 50,376.00 |
| 18 | KCE-BXF-10, 11 | 16/Jun/18 | 30 BELOW CORP. | TOLL GLOBAL FORWARDING (INDIA) PVT. LTD. | SEWAY INTERNATIONA L INC. | OOLU933 7900 | 2084 | 25008 | 28-Jun | 16-Jul | 88,518.84 | 88,518.84 |
| 19 | KCE-BXF- 12, 13 | 22/Jun/18 | 30 BELOW CORP. | TOLL GLOBAL FORWARDING (INDIA) PVT. LTD. | SEWAY INTERNATIONA L INC. | OOLU805 6180 | 2373 | 28476 | 5-Jul | 25-Jul | 97,428.96 | 97,428.96 |
| 20 | KCE-BXF-014 | 23/Jun/18 | 30 BELOW CORP. | TOLL GLOBAL FORWARDING (INDIA) PVT. LTD. | SEWAY INTERNATION AL INC. | CCLU728 1982 | 1070 | 12840 | 5-Jul | 25-Jul | 44,546.40 | 44,546.40 |
| 21 | KCE-BXF-015 | 27/Jun/18 | 30 BELOW CORP. | TOLL GLOBAL FORWARDING (INDIA) PVT. LTD. | SEWAY INTERNATIONA L INC. | OOLU979 0460 | 1141 | 13692 | 5-Jul | 25-Jul | 46,500.96 | 46,500.96 |
| 22 | KCE-BXF-016 | 28/Jul/18 | 30 BELOW CORP. | TOLL GLOBAL FORWARDING (INDIA) PVT. LTD. | SEWAY INTERNATIONA L INC. | TCNU6658 951 | 1227 | 14724 | 16-Aug | 3-Sep | 48,882.60 | 48,882.60 |
| 24 | KCE-BXF-018 | 28/Aug/18 | 30 BELOW CORP. | TOLL GLOBAL FORWARDING (INDIA) PVT. LTD. | SEWAY INTERNATIONA L INC. | OOLU676 5885 | 798 | 9576 | 6-Sep | 24-Sep | 38,287.20 | 38,287.20 |
| 25 | KCE-BXF-019 | 29/Aug/18 | 30 BELOW CORP. | TOLL GLOBAL FORWARDING (INDIA) PVT. | SEWAY INTERNATIONA L INC. | OOCU714 7294 | 1296 | 15552 | 6-Sep | 24-Sep | 49,634.64 | 49,634.64 |
| 26 | KCE-BXF- 020, 021 | 1/Sep/18 | 30 BELOW CORP. | TOLL GLOBAL FORWARDING (INDIA) PVT. | SEWAY INTERNATIONA L INC. | OOLU894 3610 | 1744 | 20928 | 13-Sep | 1-Oct | 76,954.56 | 76,954.56 |
| 27 | KCE-BXF-022 | 5/Sep/18 | 30 BELOW CORP. | TOLL GLOBAL FORWARDING (INDIA) PVT. LTD. | SEWAY INTERNATIONA L INC. | OOCU680 5317 | 710 | 8520 | 20-Sep | 8-Oct | 33,501.00 | 33,501.00 |
| 30 | KCE-BXF-025 | 17/Oct/18 | 30 BELOW | TOLL GLOBAL FORWARDING (INDIA) PVT. | SEWAY INTERNATION AL INC. | OOLU930 2420 | 732 | 8784 | 31-Oct | 19-Nov | 34,696.80 | 34,696.80 |
| | | | | | | TOTAL | | 497664 | | | | 864,061.68 |

48.     KCE still has in its possession the OBLs, without which Dhall should not have been able to obtain the KCE Goods.

49.     With the substantial aid of Toll, Seaway and Seamaster, Dhall had stolen and continues to unlawfully possess KCE Goods without title to same.

**The RE Goods:**

50.     Approximately at the same time as Dhall's transactions with KCE, Dhall entered into various agreements with RE to purchase the custom-made RE Goods, which would be delivered to Dhall in New York with Toll's aid as the Plaintiffs' forwarder.

51.     In response to each of Dhall's orders, RE immediately and without delay devoted its workers, manufacturers, quality control personnel, raw materials, machinery, vendors, and other personnel to the labor-intensive manufacturing of the RE Goods.

52.     RE then transmitted invoices to Dhall, which Dhall timely received and without objection as to the quantity of RE Goods, amounts stated, shipment dates, payment amounts and due dates.

53.     For Invoice Nos. RV-BXF-008, RV-BXF-009, RV-BXF-013, RV-BXF-014, RV-BXF-015, RV-BXF-016, RE secured Toll's services as the forwarder and entrusted the RE Goods into Toll's custody and care with instructions for Toll to deliver the containers of RE Goods to Dhall in New York upon payment for same.

54.     Upon information and belief, Toll secured the carrier services of Seamaster and Seaway to carry the cargo to the U.S.

55.     Upon informaiton and belief, the RE Goods were loaded onto the carrier in sealed containers, which seals could only be broken with RE's permission.

56.     Upon information and belief, the RE Goods arrived at the designated shipping port of destination in New York, whereupon Dhall, Toll, Seaway and Seamaster conspired to break the seals on the containers and relinquished the RE Goods to Dhall without collecting the required payment for same or notifying RE.

57.     RE would come to discover after inquiring with Toll about the status of its shipments and the unpaid invoices, that the containers not only arrived to port, but the

forwarder allowed their seals to be broken and containers emptied of RE Goods despite failing to collect payment.

58.     RE still possess the OBLs, which means that title for the RE Goods has not passed to Dhall.

59.     With the substantial aid of Toll, Seaway and Seamaster, Dhall had stolen and continues to possess the RE Goods without title to same, even as the following invoices (the "**RE Invoices**") remain unpaid:

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **RISHAV EXPORTS - COMPLETE ACCOUNT STATEMENT AS ON 22th NOV 2018** | | | | | | | | | | | |
| SR. NO. | Invoice Number | DATE | BUYER NAME | FORWARDER | AGENT NAME IN USA | CONTAINER NO | CTNS | QNTY | ETD | ETA | INVOICE AMONT (USD) | BALANCE PAYMENT (USD) |
| 15 | RV-BXF-008 | 10/Apr/18 | TIME SQUARE FOOD IMPORTS | TOLL GLOBAL FORWARDING (INDIA) PVT. LTD. | SEWAY INTERNATIONAL INC. | UASU1018791 | 1586 | 19032 | 25/Apr/18 | 14/May/18 | 71,818.56 | 71,818.56 |
| 16 | RV-BXF-009 | 8/Jul/18 | 30 BELOW CORP. | TOLL GLOBAL FORWARDING (INDIA) PVT. | SEWAY INTERNATIONAL INC. | OOCU7095652 | 1057 | 12684 | 20/Jul/18 | 10/Aug/18 | 39,826.08 | 39,826.08 |
| 20 | RV-BXF-013 | 4/Oct/18 | 30 BELOW CORP. | TOLL GLOBAL FORWARDING (INDIA) PVT. | SEWAY INTERNATIONAL INC. | OOLU8300790 | 1345 | 16140 | 17/Oct/18 | 6/Nov/18 | 60,375.36 | 60,375.36 |
| 21 | RV-BXF-014 | 11/Oct/18 | 30 BELOW CORP. | TOLL GLOBAL FORWARDING (INDIA) PVT. | SEWAY INTERNATIONAL INC. | OOLU8128309 | 882 | 10584 | 24/Oct/18 | 12/Nov/18 | 43,394.40 | 43,394.40 |
| 22 | RV-BXF-015 | 13/Oct/18 | 30 BELOW CORP. | TOLL GLOBAL FORWARDING (INDIA) PVT. | SEWAY INTERNATIONAL INC. | OOLU8656780 | 744 | 8928 | 24/Oct/18 | 12/Nov/18 | 35,901.60 | 35,901.60 |
| 23 | RV-BXF-016 | 24/Oct/18 | 30 BELOW CORP. | TOLL GLOBAL FORWARDING (INDIA) PVT. LTD. | SEWAY INTERNATIONAL INC. | TCNU7984530 | 951 | 11412 | 14/Nov/18 | 3/Dec/18 | 41,749.80 | 41,749.80 |
| 24 | RV-BXF-017 | 14/Nov/18 | 30 BELOW CORP. | FLYJAC LOGISTICS PVT. LTD. | VENTEC HITACHI TRANSPORT SYSTEM (USA), | MRKU2163736 | 806 | 9672 | 3/Dec/18 | 23/Dec/18 | 37,068.60 | 37,068.60 |
| 25 | RV-BXF-018 | 14/Nov/18 | 30 BELOW CORP. | FLYJAC LOGISTICS PVT. LTD. | VENTEC HITACHI TRANSPORT SYSTEM (USA), | SUDU6540896 | 851 | 10212 | 3/Dec/18 | 23/Dec/18 | 39,067.80 | 39,067.80 |
| | | | | | TOTAL | | | 37312 | | | | 369,202.20 |

60.     For the last two RE Invoice Nos. RV-BXF-017 and RV-BXF-018, RE hired Flyjac Logistics PVT LTD as the forwarder, who delivered the RE Goods but appropriately refused to release them into Dhall's custody following Dhall's failure to pay for them.

**Dhall's Excuses and Promises to Remit Payment.**

61.     Having received no payment, the Plaintiffs investigated the whereabouts of their Goods and discovered that the containers that housed the Goods, and which should have been at the port awaiting payment, were emptied. The Plaintiffs tracked the containers to various ports in different parts of the world when the entire time they were waiting for confirmation from Toll about the status of the Goods and Dhall's payment.

62.     Upon inquiry, Dhall merely made excuses and promises to remit payment as soon as he could, then pleaded for more time to do so.

63.     According to Dhall, there were never any issues with any of the Goods, the shipments, or the invoices; he was "working on …[the] payments".

64.     On numerous occasions by phone and in Whatsapp messages, Dhall made ongoing representations that he paid the invoiced amounts.

65.     Yet, when the Plaintiffs checked their records only to discover that Dhall lied, Dhall merely stalled for time and made further promises and representations that he would transmit the funds the next day.

66.     The following WhatsApp correspondence that took place in March 2018 between Dhall and the Plaintiffs' representative, Rishi Kapoor, are prime examples of Dhall's deceitful stalling tactics:

> [14/03/18, 8:06:18 AM] Ricky Dhall: I am calling now
> [14/03/18, 9:07:40 AM] Ricky Dhall: Sir please let me know funds have arrived now I am stressed after talking to Dad
> [14/03/18, 9:23:40 AM] Rishi Kapoor: I'll confirm at noon my time. You go to bed. I'll leave a text.
> [14/03/18, 2:38:04 PM] Rishi Kapoor: Sir no payment today !!
> [14/03/18, 3:33:18 PM] Ricky Dhall: Sir are u sure
> [14/03/18, 3:33:30 PM] Ricky Dhall: Pls check again
> [14/03/18, 3:52:06 PM] Rishi Kapoor: Yes. Checked thrice. Didn't receive anything
> [14/03/18, 4:47:59 PM] Ricky Dhall: It was sent will call at 9 leaving now for Office
> …
>  [14/03/18, 8:36:31 PM] Ricky Dhall: I am calling u in a few
> [14/03/18, 8:36:38 PM] Ricky Dhall: Working on your payments

[14/03/18, 8:38:31 PM] Rishi Kapoor: Ok boss
….
 [15/03/18, 5:39:52 PM] Rishi Kapoor: Sir pls share wire copy once you do it. Thanks.
[15/03/18, 5:43:15 PM] Ricky Dhall: Absolutely you will have
[15/03/18, 5:45:54 PM] Rishi Kapoor: Thank you
…
[16/03/18, 4:50:34 PM] Rishi Kapoor: Invoice no 1403 is not paid at all. So received much less amount than committed. PLs check and advise again

67.     The Plaintiffs' representative meticulously checked the business bank account records time and time again, only to discover that Dhall lied to delay and deflect the Plaintiffs' demands for payment.

68.     The Plaintiffs explained to Dhall that they needed timely and complete payments for the Goods in order to pay for the workers, vendors, manufacturers and other personnel who worked on fulfilling Dhall's orders:

[16/03/18, 6:18:43 PM] Rishi Kapoor: Sir pls pay today positively for the balance payments. Thank you.

[17/03/18, 12:32:19 PM] Rishi Kapoor: Nothing received today also. You promised me 1 on Tuesday, 3 on Thursday and 1 on Friday. Received only 2 payments this week.
This is much less than committed to me. Pls do not break promises as my commitments has gone haywire and we needed funds very urgently.
[17/03/18, 12:32:46 PM] Rishi Kapoor: On top of it these late payments are disturbing my production schedule also and we need to talk on that as well

69.     Still, despite Dhall's promises and representations, he remained recalcitrant and deceitful, eventually ignoring deadlines and the Plaintiffs' demands for payment, even as he continued to make excuses and promises to pay in the future:

 [01/08/18, 10:17:56 PM] Ricky Dhall: U will get 100% from me
[01/08/18, 10:18:07 PM] Ricky Dhall: I assure u

70.     Ultimately, Dhall failed to pay over $1.2 million in invoiced amounts for the Goods he had ordered, accepted, and took without Plaintiffs' permission.

71.     For its part, despite Toll's obligation not to release the Goods into Dhall's custody until Dhall paid for them, Toll, Seaway and Seamaster allowed Dhall to break into the containers and escape with stolen Goods, while the Plaintiffs remained empty-handed.

**Additional Damages of $1,946,574.58 Sustained by KCE As a Result of Dhall's Contractual Breaches.**

72.     In addition to the foregoing, the Dhall Defendants have caused KCE additional damages of $1,946,574.58 as a result of Dhall's repudiation of contractual obligations to KCE.

73.     Between March and August 2018, in accordance with the parties' course of dealing (and before KCE discovered that Dhall had defrauded it), Dhall submitted twenty-seven (27) purchase orders to KCE for custom-made goods (the "**Ordered Goods**") to be manufactured and shipped to him in New York.

74.     KCE relied on Dhall's prior course of performance and representations that payment for the Ordered Goods would be forthcoming. KCE accepted Dhall's orders not knowing that Dhall did not intend to honor his payment obligations.

75.     As per its practice, KCE issued sales confirmations and then immediately and without delay invested its own capital into hiring workers, manufacturers, quality control personnel, raw materials, machinery, vendors, and other personnel to the labor-intensive manufacturing of the Ordered Goods.

76.     Yet, in the midst of this process, Dhall broke into the containers, stole the previously-shipped Goods and refused to pay for them and for any other goods.

77.     As soon as KCE discovered Dhall's misconduct, KCE immediately stopped production on some of the Ordered Goods, but for others it was too late.

78.     For seventeen (17) of the twenty-seven purchase orders, KCE had invested $1,053,397.38 in capital and labor to design and make the fabric for Dhall's custom

Ordered Goods but halted the production process upon learning that Dhall repudiated his contractual obligations.

79.     For ten (10) of Dhall's purchase orders amounting to $893,177.20, the Ordered Goods have been manufactured and are reposed in a storage facility ready for shipment but awaiting Dhall's assurance of payment or label release.

80.     Dhall refused to pay or provide the label release, thereby preventing KCE from  mitigating its damages by attempting to sell the subject Ordered Goods to a third party.

81.     Because of the Dhall Defendants' misconduct, KCE was forced to incur additional storage charges, costs, and interest charged by its lending institution as a result of the credit crunch created by the Dhall Defendants' nonpayment. As a direct result of the Dhall Defendants' wrongdoing, KCE could not pay its employees, vendors, and suppliers; it has and continues to suffer injury to its goodwill and reputation within the exporting business.

82.     On December 19, 2018, the Plaintiffs transmitted a letter to all Defendants, demanding payment for the Goods manufactured and shipped by Toll, Seaway and Seamaster, and then stolen by Dhall; the Plaintiffs also requested that Dhall cover the costs they incurred on his behalf in connection with the Ordered Goods, as well as to release the label for the subset of the Ordered Goods that had been manufactured in order to allow Plaintiffs to mitigate their damages.

83.     In an email dated about January 1, 2019, Dhall responded to the Plaintiffs demand letter by saying that "this route is not going to get anything done" and it would only push Dhall to "shut down and if that happens nothing will happen."

84.     As for the Plaintiffs' trusted bailee, Toll's representative sent the following email to Plaintiffs' counsel on December 20: "This is to acknowledge receipt of your humorous letter. If your clients were victims of a con, then they have my sympathy. Toll

can't be held liable for your clients' choice of customers. I wish your clients luck in proceeding against the customer."

**COUNT I**
**FOR TRADE CONTRACT PRICE OF <u>KCE GOODS</u> UNDER U.C.C. § 2-709(1)(A)**
**(Against Dhall Defendants)**

85.     The Plaintiffs repeat and re-allege each of the foregoing allegations as if fully set forth herein.

86.     Pursuant to U.C.C. § 2-709(1)(a), "when the buyer fails to pay the price as it becomes due the seller may recover, together with any incidental damages under the next section, the price of goods accepted…."

87.     As set forth above, Dhall ordered **$864,061.68** worth of KCE Goods from KCE and entered sales contracts with the Plaintiff on behalf of 30 Below/TSFI/Seena. KCE immediately and without delay, devoted capital, workers, manufacturers, quality control personnel, raw materials, machinery, vendors, and other personnel to the labor-intensive manufacturing of the conforming KCE Goods.

88.     KCE discharged its obligations under the terms of the sales contracts between KCE and Dhall Defendants and in accordance with the parties' course of dealing by manufacturing confirming KCE Goods and causing them to be timely delivered to the designated port in New York.

89.     Dhall received the KCE Invoices and accepted the terms memorialized therein, including the payment amounts and payment deadlines.

90.     Dhall inspected and accepted the KCE Goods, did not issue a seasonable notice of rejection or express an intent to reject the KCE Goods.

91.     Following months of Dhall's delays, excuses, and promises to remit payment, even as he acknowledged the balance owed on the Invoices, Dhall failed to pay the principal balance of **$864,061.68** owed to KCE.

92.     Upon information and belief, at all relevant times, 30 Below, TSFI, and Seena were all fungible, undercapitalized companies owned and operated by Dhall and

Bhasin, which all share the same business address, and which Dhall and Bhasin intentionally deployed to defraud Plaintiffs and evade their contractual obligations. Corporate defendants 30 Below, TSFI, and Seena are all alter egos of one another; Dhall and Bhasin have dominated and controlled the family-owned corporations, fostered the conversion of goods and wrongfully profited from it.

93.    As a result of Dhall's failure to pay for price of KCE Goods, the Dhall Defendants are jointly and severally liable for the principal amount of **$864,061.68,** together with any incidental damages, costs, attorneys' fees, and pre-judgment interest at the rate of 9%, the full amount of which shall be assessed at trial.

## COUNT II
## FOR TRADE CONTRACT PRICE OF <u>RE GOODS</u> UNDER U.C.C. § 2-709(1)(A)
### (Against Dhall Defendants)

94.    The Plaintiffs repeat and re-allege each of the foregoing allegations as if fully set forth herein.

95.    Pursuant to U.C.C. § 2-709(1)(a), "when the buyer fails to pay the price as it becomes due the seller may recover, together with any incidental damages under the next section, the price of goods accepted…."

96.    As set forth above, Dhall ordered **$369,202.20** worth of RE Goods from RE and entered sales contracts with the Plaintiff on behalf of 30 Below/TSFI/Seena. RE immediately and without delay devoted its capital, workers, manufacturers, quality control personnel, raw materials, machinery, vendors, and other personnel to the labor-intensive manufacturing of the conforming RE Goods.

97.    RE discharged its obligations under the terms of the sales contracts between RE and Dhall Defendants and in accordance with the parties' course of dealing by manufacturing confirming RE Goods and causing them to be timely delivered to the designated port in New York.

98.    Dhall received the RE Invoices and accepted the terms memorialized therein, including the payment amounts and payment deadlines.

99.     Dhall inspected and accepted the RE Goods, did not issue a seasonable notice of rejection or express an intent to reject the RE Goods.

100.    Following months of Dhall's delays, excuses, and promises to remit payment, even as he acknowledged the balance owed on the Invoices, Dhall failed to pay the principal balance of **$369,202.20** owed to RE.

101.    Upon information and belief, at all relevant times, 30 Below, TSFI, Seena were all fungible, undercapitalized companies owned and operated by Dhall and Bhasin, which all share the same business address, and which Dhall and Bhasin intentionally deployed to defraud Plaintiffs and evade their contractual obligations. Corporate defendants 30 Below, TSFI, and Seena are all alter egos of one another; Dhall and Bhasin have dominated and controlled the family-owned corporations, fostered the conversion of goods and wrongfully profited from it.

102.    As a result of Dhall's failure to pay for price of RE Goods, the Dhall Defendants are jointly and severally liable for the principal amount of **$369,202.20**, together with any incidental damages, costs, attorneys' fees, and pre-judgment interest at the rate of 9%, the full amount of which shall be assessed at trial.

### COUNT III
### ACCOUNT STATED
### (Against Dhall Defendants)

103.    The Plaintiffs repeat and re-allege each of the foregoing allegations as if fully set forth herein.

104.    Under New York law, a claim for account stated requires a plaintiff to establish: (1) an account was presented; (2) the account was accepted as correct; and (3) the debtor promised to pay the amount stated.

105.    As described herein, Dhall acknowledged multiple times that he and his companies were jointly indebted to Plaintiffs for the accounts stated in the RE Invoices and KCE Invoices, which were presented to Dhall.

106.     Dhall repeatedly promised to pay Plaintiffs the full amount due and owing, as reflected in multiple text messages with the Plaintiffs' representative.

107.     Upon information and belief, at all relevant times, 30 Below, TSFI, Seena were all fungible, undercapitalized companies owned and operated by Dhall, which all shared the same business address, and which Dhall and Bhasin intentionally deployed to defraud Plaintiffs and evade their collection efforts.

108.     As a result of foregoing, the Dhall Defendants are jointly and severally liable to RE for **$369,202.20**, and to KCE for **$864,061.68**, together with respective interest, costs and attorneys' fees, the amount of which will be assessed at trial.

## COUNT IV
## BREACH OF FIDUCIARY DUTIES
### (Against Toll)

109.     The Plaintiffs repeat and re-allege each of the foregoing allegations as if fully set forth herein.

110.     As the principal forwarder for Plaintiffs, Toll owes Plaintiffs fiduciary duties of care and loyalty with respect to the Goods entrusted into its care and custody.

111.     Toll breached its fiduciary duties when it betrayed the Plaintiffs and surrendered the Goods to Dhall without the required payment.

112.     Despite its instructions from Plaintiffs, Toll allowed Dhall to break the seals on the containers and steal the Goods, even as the Plaintiffs remained in possession of the OBLs.

113.     Further, Toll breached its duties of care in hiring Seaway and Seamaster, which substantially assisted in Dhall's fraudulent conversion of Goods.

114.     As a result of Toll's breaches of fiduciary duties, the Plaintiffs were damaged in an amount to be determined at trial, but which is reasonably believed to be at least **$1,157,127.48**, together with an award of punitive and other special damages, costs, applicable interest, and reasonable attorneys' fees.

**COUNT V**
**BREACH OF CONTRACT**
**(Against Toll)**

115.    The Plaintiffs repeat and re-allege each of the foregoing allegations as if fully set forth herein.

116.    The elements of a breach of contract claim are: (1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages.

117.    The Plaintiffs entered into a contract with Toll, pursuant to which Toll was to take custody of the Goods, secure a sea carrier, issue the OBLs, deliver the Goods to New York, and, after securing payment for same, alerting Plaintiffs to release the OBLs (thus transferring title of the Goods to the consignee).

118.    Toll transmitted to Plaintiffs the OBLs showing that Toll retained Seamaster and Seaway to carry the Goods.

119.    The Plaintiffs paid Toll for its services as their principal forwarder.

120.    Toll materially breached the terms of its agreement with the Plaintiffs when it released the Goods into Dhall's custody without first securing payment, arranging for the release of OBLs, and notifying Plaintiffs.

121.    As a result of Toll's material breach, the Plaintiffs were damaged in an amount to be determined at trial, but which are reasonably believed to be at least **$1,157,127.48**, together with applicable interest, costs, and reasonable attorney's fees, the amount of which will be assessed at trial.

**COUNT VI**
**CONVERSION**
**(Against Dhall Defendants)**

122.    The Plaintiffs repeat and re-allege each of the foregoing allegations as if fully set forth herein.

123.    The Plaintiffs are, and, at all relevant times have been, the legal and equitable owners of the Goods.

124.     As set forth above, the Dhall Defendants wrongfully took possession of the Goods and thereby unlawfully acquired the Plaintiffs' property without permission and against their will.

125.     Despite due demand therefore, the Dhall Defendants have refused (and continue to refuse) to return, provide access to, or provide payment for the Goods, and they continue to retain custody and control of the Goods and/or the funds resulting from their sale.

126.     The Dhall Defendants are deliberately exercising unlawful dominion and control over the Plaintiffs' property.

127.     By their actions, the Dhall Defendants have wrongfully converted property belonging to the Plaintiffs for their own use and, in so doing, intended to permanently deprive the Plaintiffs of its use and enjoyment of the same.

128.     Further, as set forth herein, Dhall and Bhasin have dominated and controlled the corporate defendants 30 Below, TSFI, and Seena, and fostered the conversion of goods from which the Dhall Defendants wrongfully profited.

129.     Accordingly, the Dhall Defendants are jointly and severally liable for the actual damages arising from the conversion of the Goods in an amount to be determined at trial, but which are reasonably believed to be at least **$1,157,127.48** together with an award of punitive and other special damages, costs, applicable interest, and reasonable attorneys' fees.

**COUNT VII**
**AIDING AND ABETTING CONVERSION**
**(Against Toll, Seaway, and Seamaster)**

130.     The Plaintiffs repeat and re-allege each of the foregoing allegations as if fully set forth herein.

131.     As set forth herein, the Dhall Defendants have wrongfully converted property belonging to the Plaintiffs for their own use and, in so doing, intended to permanently deprive the Plaintiffs of its use and enjoyment of the same.

132.    Defendants Toll, Seamaster, and Seaway knew that they could not release the Goods from their custody without payment and discharge of the OBLs because title of the Good would not pass to the consignee.

133.    Despite knowing that releasing the Goods into Dhall's custody would be unlawful, Toll, Seamaster, and Seaway did so anyway, thus substantially assisting the Dhall Defendants' conversion of the Goods.

134.    Without the substantial aid of the aforesaid Defendants, the Dhall Defendants would not be able to take unlawful possession of the Plaintiffs' Goods.

135.    Accordingly, Toll, Seamaster, and Seaway are jointly and severally liable for actual damages arising from their substantial assistance with the conversion of the Goods by Dhall Defendants in an amount to be determined at trial, but which are reasonably believed to be at least **$1,157,127.48** together with an award of punitive and other special damages, costs, applicable interest, and reasonable attorneys' fees.

<u>COUNT VIII</u>
**BREACH OF LEGAL DUTIES UNDER COGSA**
**(Against Seaway and Seamaster)**

136.    The Plaintiffs repeat and re-allege each of the foregoing allegations as if fully set forth herein.

137.    Upon information and belief, Seaway and Seamaster are common carriers of goods within the meaning of the Carriage of Goods by Sea Act, 46 U.S.C. §30701 ("COGSA").

138.    As common carriers of merchandise, Seaway and Seamaster had a duty to exercise reasonable care while the Goods were in their possession and control.

139.    Seaway and Seamaster breached their duties under COGSA by allowing Dhall Defendants to steal the Goods, resulting in damages to Plaintiffs.

140.    By reason of the Seaway and Seamaster's breaches of their duties under COGSA, the defendants are jointly and severally liable to Plaintiffs in an amount to be determined at trial, but not less than **$1,157,127.48,** together with an award of punitive and other special damages, costs, applicable interest, and reasonable attorneys' fees.

23

## COUNT IX
## BREACH OF CONTRACT
### (Against Dhall Defendants)

141.    The Plaintiffs repeat and re-allege each of the foregoing allegations as if fully set forth herein.

142.    The Plaintiffs entered into various valid and binding agreements to manufacture and deliver the RE Goods, KCE Goods, and the Ordered Goods to Dhall in New York in exchange for payment for same.

143.    The Plaintiffs fully performed their obligations with respect to the RE Goods and the KCE Goods by manufacturing the conforming goods and delivering them to the designated shipping port.

144.    The Plaintiffs substantially performed their contractual obligations with respect to the Ordered Goods by completing or substantially completing the manufacturing process.

145.    The Dhall Defendants breached their contractual obligations by failing to pay for the RE Goods and the KCE Goods and repudiated their obligations with respect to the Ordered Goods.

146.    As a result of Dhall's material breaches, the Plaintiffs have suffered and continue to suffer damages in an amount of $3.2 million.

147.    Further, upon information and belief, at all relevant times, 30 Below, TSFI, and Seena were all fungible, undercapitalized companies owned and operated by Dhall and Bhasin, which all share the same business address, and which Dhall and Bhasin intentionally deployed to defraud Plaintiffs and evade their contractual obligations.

148.    Consequently, the Dhall Defendants are jointly and severally liable for the damages amounting to at least $3.2 million, together with any incidental damages and pre-judgment interest at the rate of 9%, the full amount of which shall be assessed at trial.

**COUNT X**
**UNJUST ENRICHMENT**
**Against Dhall Defendants**

149.    The Plaintiffs repeat and re-allege each of the foregoing allegations as if fully set forth herein.

150.    Dhall Defendants placed orders for the Ordered Goods, and in reliance on those orders, Plaintiffs invested their capital, skill and labor to manufacture the conforming goods. The Dhall Defendants  accepted the finished  Goods that arrived to New York and took those Goods from Plaintiffs without due payment, then repudiated their payment obligations with respect to the Ordered Goods after Plaintiffs invested their capital, time and resources into manufacturing them. Therefore, Dhall Defendants have realized and continue to realize substantial financial gains from their unlawful activities.

151.    Consequently, the Dhall Defendants have been and continue to be unjustly enriched at the Plaintiffs' expense.

152.     The Plaintiffs are therefore entitled to recover those sums by which the Dhall Defendants have been and will hereafter be unjustly enriched, including costs, applicable interest, and reasonable attorney's fees, the amount of which shall be determined at trial.

**COUNT XI**
**INDEMNITY**
**(Against Dhall Defendants)**

153.    The Plaintiffs repeat and re-allege each of the foregoing allegations as if fully set forth herein.

154.    For the last two RE Invoice Nos. RV-BXF-017 and RV-BXF-018, RE hired FlyJac Logistics PVT LTD ("**FlyJac**") as the forwarder, who delivered the RE Goods but appropriately refused to release them into Dhall's custody following Dhall's failure to pay for them.

155.    RE has performed all of its obligations and conditions with respect to FlyJac and the Goods shipped by or through FlyJac.

156.     The Plaintiffs have and/or will deny liability with respect to any and all damages that have been or will be sustained by FlyJac with respect to the RE Goods and Dhall Defendants' nonpayment for same.

157.     If adjudged that the Plaintiffs are liable for a portion or all of FlyJac's costs and damages, the Plaintiffs shall be entitled to recover from Dhall Defendants, in contribution or indemnity, for all losses, damages or expenses, including attorneys' fees, to the extent permitted under law.

*WHEREFORE*, for the reasons set forth herein, the Plaintiffs demand Judgment and Order against each of the Defendants on the above counts for:

a. **Count I:** the principal amount of **$864,061.68,** together with any incidental damages and pre-judgment interest at the rate of 9%, the full amount of which shall be assessed at trial;

b. **Count II:** the principal amount of **$369,202.20,** together with any incidental damages and pre-judgment interest at the rate of 9%, the full amount of which shall be assessed at trial;

c. **Count III:** the principal amount of **$1,233,263.88**, together with interest, costs and attorneys' fees, the amount of which will be assessed at trial;

d. **Count IV:** the principal amount of **$1,157,127.48**, together with an award of punitive and other special damages;

e. **Count V:** the principal amount of **$1,157,127.48**, together with applicable interest and costs, the amount of which will be assessed at trial

f. **Count VI:**  actual damages of  **$1,157,127.48** together with an award of punitive and other special damages;

g. **Count VII:** actual damages of **$1,157,127.48** together with an award of punitive and other special damages;

h. **Count VIII:**  actual damages of  **$1,157,127.48**, together with an award of punitive and other special damages.;

i. **Count IX:** damages amounting to at least **$3.2** million, together with any incidental damages and pre-judgment interest at the rate of 9%, the full amount of which shall be assessed at trial;

j. **Count X:** damages to be determined at trial;

k. **Count XI:** determination that Plaintiffs are indemnified from all losses, damages or expenses associated with the RE Goods transported by FlyJac;

l. **On all Counts**: interest, costs and reasonable attorneys' fees, where applicable; and

m. Whatever other and further relief the Court deems just and proper.


Dated:        New York, NY
              January 27, 2019

Respectfully submitted:

**Sam P. Israel, P.C.**

By: */s/Sam P. Israel*
Sam P. Israel, Esq. (SPI 0270)
Eleonora Zlotnikova (EZ8814)
180 Maiden Lane, 6th Floor
New York, NY 10038
T: (646) 787-9880 | F: (646) 787-9886
E: samisrael@spi-pc.com
*Counsel for Plaintiffs*